# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

ANTON T. BLEVINS,

       Defendant-Appellant.

FOR PUBLICATION
January 12, 2016

No. 315774
Wayne Circuit Court
LC No. 12-001086-FC

Before: RONAYNE KRAUSE, P.J., and K. F. KELLY and SHAPIRO, JJ.

SHAPIRO, J. (*dissenting*).

Late on May 5, 2011, there was a brief, but deadly confrontation between two groups of young men in downtown Detroit. As the two groups faced each other, a man from one group fired eight to ten gunshots at the other group. The shots struck two men, killing Courtney "Cortez" Smith and wounding Carlos Spearman.

Following the incident, defendant Anton Blevins and codefendant Quentin King were charged with first-degree premediated murder, MCL 750.316, several counts of assault with intent to murder, MCL 750.83, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.224b.

The prosecution presented evidence that King fired the shots that killed Smith and wounded Spearman. He was convicted as charged.[1] The charges against Blevins were based on evidence that he initially displayed the gun and then handed it to King. The defense theory was that although defendant was present, he was not the man who handed the gun to King.

Defendant was convicted of second-degree murder, MCL 750.317, multiple counts of assault with intent to do great bodily harm less than murder, MCL 750.84, and felony firearm.

---

[1] Although the jury convicted King as charged, he is not a party to this appeal. A separate panel of this Court affirmed his conviction, but remanded for resentencing in light of *Miller v Alabama*, ___ US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012) and MCL 769.25. *People v King*, unpublished opinion per curiam of the Court of Appeals, issued July 23, 2015 (Docket No 315953), p 6-7.

-1-

Defendant raises several issues on appeal. I conclude that a new trial is merited because of errors arising out of the eyewitness identification testimony and because the prosecutor's closing argument substantially misstated the legal standards by which the jury could convict defendant on an aiding and abetting theory.

## I. EYEWITNESS IDENTIFICATION TESTIMONY

It is undisputed that this case turned exclusively on the jury's evaluation of eyewitness identification testimony. There was no forensic evidence linking Blevins to the gun, no evidence of robbery, and no evidence of any prior bad blood between Blevins and the victims. Although Blevins's attorney conceded that Blevins was among the group of men standing with King, there was no evidence that anyone in the group, other than the man who handed him the gun, did anything to assist King in the crimes. Thus, the question of identification was not whether Blevins was present. Instead the question was whether Blevins was the man who displayed a gun and then gave it to King before the shooting. I agree with the majority that the evaluation of a witness's honesty is one exclusively for the jury; they, not we, hear and see the witnesses and are in the best position to make such determinations. However, the majority fails to distinguish between the issues of truthfulness and reliability. Unlike truthfulness, questions of reliability turn on factors other than the good faith and subjective honesty of the witness.

## A. PRINCIPLES OF EYEWITNESS IDENTIFICATION

The reliability of eyewitness identifications has generally been understood to turn on external factors, such as those referenced in M Crim JI 7.8, including distance, time of exposure, and lighting. However, in the last several decades, the nature and function of memory, long considered to be something beyond science, has become a subject of advanced research and peer-reviewed scientific publications.[2] This research has demonstrated beyond question that the reliability of eyewitness testimony is not limited to external factors or even to individual matters such as the quality of a witness's eyesight. For better or for worse, much of what these studies have revealed is highly inconsistent with our intuition about how memory functions. The studies show that our "common sense" beliefs about memory, i.e. the intuitive understanding that nearly all jurors (and judges) will bring to bear, is grossly incomplete and often in error. Again, these

---

[2] "[O]ver two thousand studies on eyewitness memory have been published in a variety of professional journals over the past 30 years. . . . Even more remarkable is the high degree of consensus that the researchers report in their findings." Report of the Special Master, *State v Henderson*, No. A-8-08 (2008), p 9, http://www.judiciary.state.nj.us/pressrel/HENDERSON%20FINAL%20BRIEF%20.PDF%20(00 621142).PDF, accessed September 29, 2015.

In addition to the Report of the Special Master, which cites many such studies, a literature review can be found in Trenary, *State v Henderson: A Model for Admitting Identification Testimony*, 84 U Colo L Rev 1257 (2013) and in Hallisey, *Experts on Eyewitness Testimony in Court—A Short Historical Perspective*, 39 How LJ 237 (1995).

conclusions are supported by a wealth of scientific studies[3] and have passed muster as admissible under both the *Daubert*[4] and *Frye*[5] tests.[6]

Scientific developments have often required the modification of evidentiary standards and trial proofs. The core function of evidentiary standards is to enhance the truth-finding process.[7] When scientific advances allow for a significant increase in the accuracy of that process, the judiciary should investigate and use those advances, rather than merely reiterating its faith in longstanding practices. The development of fingerprint evidence, blood typing, and DNA matching each presented challenges to the conduct of both investigations and trials. While these scientific developments upset preexisting mechanisms of truth-finding, their use was ultimately recognized by the Michigan courts and we now rely on them as critical mechanisms to enhance the likelihood of conviction of the guilty and acquittal of the innocent. It is now time for the law to take into account what is known about memory formation, storage, and retrieval.

The consistent finding in the scientific studies of human memory is that, rather than being a single function, memory is made up of multiple, intricate brain operations that govern perception, memory formation, storage, and retrieval. Each of these functions is more complex and subject to far more distortion and error than we previously knew.

> *The overriding principle that has emerged is that memory does not function like a videotape, accurately and thoroughly capturing and reproducing a person, scene or event, but is instead a constructive dynamic and selective process.* Memories must endure the complex processing required for encoding,

---

[3]Dr. Colleen Seifert, a professor of cognitive psychology at the University of Michigan, who has published extensively in the field, submitted an affidavit in support of defendant's motion for new trial. Dr. Seifert's affidavit states that there is now a "generally accepted body of scientific research" in this area based upon the *"three to four hundred peer-reviewed articles . . . published each year* to professional research journals *that demonstrate the social and cognitive factors affecting eyewitness accuracy,"* and that their findings have been *"replicated across hundreds of studies"* involving the "test[ing] of thousands of individuals" with *"statistically reliable results."* (emphasis added).

[4] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

[5] *Frye v United States*, 293 F 1013, 1014; 54 App DC 46 (1923)

[6] For a summary of state and federal law on this issue see Vallas, *A Survey of Federal and State Standards for the Admission of Expert Testimony on the Reliability of Eyewitnesses*, 39 Am J Crim L 97, 136-138 (2011).

[7] "[T]he primary objective of procedural rules should be to facilitate the discovery of truth. . . . [T]ruth must be the goal of any rational procedural system[.]" Grano, *Implementing the Objectives of Procedural Reform: The Proposed Michigan Rules of Criminal Procedure—Part 1,* 32Wayne L Rev 1007, 1011 (1986).

storage, and retrieval. In the encoding or acquisition stage, the witness perceives an event and enters the information into memory. The storage or retention stage is the period between when the memory is encoded and when the witness attempts to retrieve it. The retrieval stage represents the witness's attempt to recall the stored information from memory. Memories are vulnerable to distortion, contamination, and falsification at each step. Eyewitnesses encode limited data bits and then their brains tend to fill in the gaps with whatever else seems plausible under the circumstances. Memories rapidly and continuously decay and may be covertly contaminated by suggestive influence—including by law enforcement officers during interviewing and identification procedures. [Trenary, *State v Henderson: A Model for Admitting Eyewitness Identification Testimony*, 84 U Colo L Rev 1257, 1264 (2013) (emphasis added) (quotation marks and citations omitted).]

Contrary to our intuition, neuroscience and cognitive studies demonstrate that what is stored in a person's memory can be changed over time, particularly where there are repeated retrieval attempts as a result of prompting. The gaps in memory can be "filled in" with information that is subjectively experienced as if part of the initial memory of the event.

There are several factors that are not adequately addressed in our present jury instruction that are of particular significance with regards to crime scenes. These inadequately addressed factors can lead to a disturbingly high error rate. First, although the stress and fear that accompanies these experiences make it likely that the witness will remember the event, the stress and fear also serve to "interfere with the ability to encode reliable details." *Id.* at 1275. "[A] *meta-analysis incorporating twenty-seven independent studies found that . . . only 39 percent [of eyewitnesses] made a correct identification after a high-stress situation.*" *Id.*; see also Deffenbacher, *A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory*, 28 Law & Hum Behav 687 (2004). Second, delays in identification result in higher error rates of later recall. Studies of the decay rate of memory show that 20 percent of memory quality is lost after two hours, 30 percent within a day, and 50 percent within a month. *State v Henderson: A Model for Admitting Eyewitness Identification Testimony*, 84 U Colo L Rev at 1277. "Longer intervals between the event and identification are associated with fewer correct identifications." *Id.* Third, mistaken familiarity may cause the witness to identify as the perpetrator a person who was merely present at the crime scene or who, while not present, was viewed by the witness at a lineup. *Id.* at 1278.

Unfortunately, our "common sense" belief that identification errors are rare is false. Cognitive studies have demonstrated that such errors are likely commonplace. "[A] review of published scientific research suggests that *one-third to one-half of eyewitness identifications are simply wrong.*" *Id.* at 1260 (emphasis added). As a result, eyewitness misidentification has been "widely recognized as the single greatest cause of wrongful convictions in this country." *State v Delgado*, 188 NJ 48, 60; 902 A2d 888 (2006). Not surprisingly, therefore, the majority of post-conviction DNA exonerations have involved eyewitness misidentifications. *State v Henderson: A Model for Admitting Eyewitness Identification Testimony*, 84 U Colo L Rev at 1260.

The risk of misidentification leading to a wrongful conviction is significantly heightened by the fact that our present instruction directs jurors to consider "how sure the witness was about

the identification."[8]  Indeed, the studies have repeatedly demonstrated that the degree of certainty expressed by the identifying witness is considered by jurors to be a strong sign of reliability. This belief is common, but it is in error.  Studies have repeatedly revealed that "witness confidence is only weakly related to the accuracy of the identifications."  Penrod & Cutler, *Eyewitness Expert Testimony and Jury Decisionmaking*, 52 Law & Contmp Probs 44, 83 (1989). Thus, although a juror is far more likely to accept the testimony of an eyewitness who states that he is "100% certain" of his identification, the likelihood that the identification is accurate is no greater than that of an identification expressed with much less certainty.  Put simply, this aspect of the standard jury instruction given in this and nearly all cases is factually erroneous and grossly misdirects the jury.[9]

Similarly, while the standard jury instruction directs the jury to consider the "state of mind" of the witness during the recalled event, it offers no guidance as to which states of mind are likely to result in more or less reliable memories.[10]  How is a juror to know whether a person is more or less likely to accurately perceive, store, and recall information when they are surprised, angry, frightened or otherwise stressed? [11]  Advising the jurors simply that they are to consider the witness's state of mind without informing them of the generally accepted research-based knowledge about the objective effect of those states of mind on memory is nothing more than an invitation to jury speculation.  We currently leave that to the arguments of counsel, who may each tell the jury their version of what "common sense" dictates and whose attempts at persuasion are not restrained by actual scientific knowledge. [12]

---

[8] M Crim JI 7.8(3).

[9] Greene, *Eyewitness Testimony and the Use of Cautionary Instructions*, 8 U Bridgeport L Rev 15 (1987) (traditional jury instructions on eyewitness testimony are of minimal effect).

[10] M Crim JI 7.8(2).

[11] In her affidavit in support of defendant's motion for new trial, Dr. Seifert, offered this criticism of our present jury instruction:

> While well intentioned, the instructions do not provide guidelines to the jurors about how to apply them, for example, what amount of time passing since the incident is likely to lead to correct identification, and what states of mind lead to less accuracy?  Further, these instructions do not include warnings about known biasing factors, such as the presence of a weapon during the crime, discussions among witnesses about the suspects and effects of [police] instructions.

[12] We generally do not allow jurors to apply their intuition where there is available scientific evidence to the contrary.  For example, in a medical malpractice case, a plaintiff's lawyer may seek to take advantage of a lay person's intuition that a catastrophic injury resulting from a medical procedure is proof that the procedure was incorrectly performed.  We do not shield the jurors from scientific information that shows this "common sense" conclusion to be incorrect. We permit the defense to introduce expert testimony to the contrary and even instruct jurors that an adverse outcome is not, in and of itself, sufficient to show negligence. M Civ JI 30.04.  The

States have taken various approaches to permitting expert testimony about the factors relevant to assessing the reliability of eyewitness identifications. According to a recent article in the American Journal of Criminal Law, the overwhelming majority of state courts and federal circuits allow such testimony at the discretion of the trial judge. Fourteen states and two federal circuits have rules that either encourage or require its admission where eyewitness testimony is the only evidence of guilt. Six states and one federal circuit bar such testimony altogether, although one of these states permits it where eyewitness identification is the sole evidence of guilt. *A Survey of Federal and State Standards for the Admission of Expert Testimony on the Reliability of Eyewitnesses*, 39 Am J Crim L 97, 136-138 (2011).

New Jersey has taken the lead in addressing this problem through revised jury instructions rather than expert testimony. In *State v Henderson*, 208 NJ 208, 217; 27 A 3d 872 (2011), the New Jersey Supreme Court appointed a special master to review the relevant scientific literature. After a review of over 200 published scientific articles submitted by the parties and 10 days of testimony, the special master issued a highly detailed report in which he concluded that the research "abundantly demonstrates the many vagaries of memory encoding, storage and retrieval; the malleability of memory; the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of eyewitness identifications." Report of the Special Master, *State v Henderson*, No. A-8-08 (2008), pp 72-73. The special master further concluded that the traditional mechanisms for considering the reliability of eyewitness testimony "neither recognizes nor systematically accommodates the full range of influences shown by science to bear on the reliability of such testimony." *Id*. at 76.

Following its receipt of the report of the special master, the New Jersey Supreme Court issued its opinion in *Henderson* and with it adopted jury instructions intended to provide jurors with sufficient guidance so as to allow them to evaluate the reliability of eyewitness identifications with greater accuracy and without the need for expert testimony. See *Henderson*, 208 NJ at 296-297;[13] See also Press Release, *Supreme Court Releases Eyewitness Identification Criteria for Criminal Cases*, July 19, 2013.[14]

There is scant Michigan caselaw concerning this issue. The sole published case appears to be *People v Hill*, 84 Mich App 90, 95-96; 269 NW2d 492 (1978), where we held that such

---

general principle of reliance on the common sense of jurors is not an excuse to ignore demonstrable scientific data that runs counter to that common sense.

[13]The New Jersey Supreme Court adopted two instructions. One addresses out-of-court identifications and the other addresses in-court identifications. Each informs the jury that they are to determine whether the identification is sufficiently reliable. They offer brief general information about memory and list numerous variables, indicating whether the presence of those variables tends to increase or decrease an eyewitness identification.

[14] https://www.judiciary.state.nj.us/pressrel/2012/pr120719a.htm, last accessed September 30, 2015.

evidence may be proper in some cases and left the matter to the trial court's discretion.[15] However, the need to address the reliability of eyewitness identification has not gone wholly unaddressed. The Michigan State Bar established the Michigan Eyewitness Identification Task Force[16] which issued two reports in 2012: "Prosecutor Eyewitness Identification Training Guide" and "Law Enforcement and Eyewitness Identifications: A Policy Writing Guide." These reports highlighted that the problem of potential misidentification creates the greatest risk of a miscarriage of justice when "there is minimal or no circumstantial evidence to support a witness or witness's identification in a stranger situation." State Bar of Michigan, *Prosecutor Eyewitness Identification Training Guide* (2012), p 1. In such a situation, "*extreme caution must be taken due to the possibility of misidentification.*" *Id*. (emphasis added). After listing multiple factors to consider as to identification reliability, the report cites to *Henderson* for a "detailed explanation defining each of [the] factors and explaining how they affect reliability." *Id*. at p 4. The guide sets forth detailed, step-by-step research-based methods to assure accurate identifications. *Id*. at pp 1-4. Implementation of these methods, at the point before a prosecution begins, may substantially reduce the number of cases in which the reliability of an eyewitness account is seriously questioned by assuring that the identifications were initially made under reliable conditions.

Once a trial begins, however, it remains for the jury to perform its truth-finding role. Accordingly, the jury must be reasonably informed of the scientific understanding of how memory functions and what factors research has shown to be indicative of reliability or a lack thereof. The Supreme Court may wish to direct the Model Criminal Jury Instruction Committee or some other body suited to the task to undertake the work necessary so as to allow the Court to refine M Crim JI 7.8 in light of generally accepted scientific principles. Such an approach would provide consistency and would avoid the inefficient presentation of expert testimony on a case-by-case basis. [17]

At the present time, however, M Crim JI 7.8 remains as our standard instruction on eyewitness testimony and until such a revision occurs, it is incumbent upon defense attorneys, particularly in cases that rest solely on eyewitness identification, to request a special jury instruction or to proffer expert testimony.

---

[15] The *Hill* Court reversed defendant's conviction and remanded for new trial based on a separate challenge to the basis of two in-court identifications and the failure of the lower court to conduct the necessary evidentiary hearing. *Hill*, 84 Mich App at 94-95.

[16] The task force was co-chaired by Nancy Diehl, former Chief of the Trial Division of the Wayne County Prosecutor Office and Valerie Newman, staff attorney with the State Appellate Defender Office. Its members included four trial judges, two appellate judges, several prosecutors and several defense attorneys.

[17] See generally *United States v Hall*, 165 F3d 1095, 1118-1120 (1999) (EASTERBROOK, J., concurring).

At the *Ginther*[18] hearing in this case, defense counsel stated that he was generally unaware of the literature on witness identification, that he had not thought there were any issues to be made about the photo arrays, and that he was not familiar with the State Bar 2012 policy writing guide for law enforcement as to eyewitness identification. He stated that he did not consult with an expert nor consider requesting a special or modified instruction on identification.

It is with these issues in mind that we should conduct our review of the eyewitness testimony in this case.

## B. THE EYEWITNESS IDENTIFICATION TESTIMONY

All the witnesses traveled to downtown Detroit to celebrate Spearman's college graduation. In addition to Spearman, the witnesses were: Zachery Easterly, Phillip Knot, Raleigh Ross, DeMario Drummond and Raymond Malone. Of these six eyewitnesses, two did not recall Blevins being present. Three others identified defendant as present among the group of six or seven individuals with King, but did not see Blevins pass a gun to King. Two witnesses testified that Blevins gave King a gun. Their testimony will be summarized *seriatim*.

## 1. SPEARMAN

Spearman was shot and wounded in the incident. He testified that he never saw the man who shot him, and he could not identify Blevins as having passed the gun or even as being present during the incident.

## 2. EASTERLY

Easterly testified that, except for himself and decedent Smith, all the members of his group had been drinking. He stated that the incident began at about 11:30 p.m. when he walked some distance away from his group and urinated in a parking lot. He said a "dark skinned" black male who he identified as King confronted him about urinating. He said that King and a second man—who he stated was not Blevins—cornered him against a wall. He testified that King punched him in the nose causing him to bleed profusely. Shortly thereafter the rest of Easterly's group rejoined him and, seeing his injury, they started "walking up on" King and a group of four or five men with whom King was standing.

Easterly testified that he was about 25 feet from the men in King's group and that he saw a "light skinned" black man take a silver gun out of his waistband and fire one shot at the ground.[19] Easterly testified that he immediately hid behind a car and that he heard additional shots fired, but did not see who fired them.

---

[18] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[19] The other witnesses testified that King fired all the shots, including the one at the ground.

Easterly did not identify Blevins as the man who drew or fired the gun. He did not identify Blevins even as having been present during the incident. He testified that it was "too far back to recall."

Easterly also testified as to pretrial identification procedures. He stated that four days after the shooting, the police showed him a photo array made up of headshots[20] of six individuals. Though neither Blevins's nor King's photos were in this array, Easterly selected two individuals, both of whom the police determined were not suspects. Two weeks later, Easterly was shown a second photo array of headshots. This array included King, who Easterly selected as possibly being the shooter. Several weeks later, on June 10, Easterly was shown another array of six headshots. Blevins's photo was in this set, but Easterly did not select it.

### 3. KNOT

Because he did not appear when subpoenaed for the preliminary examination, Knot testified pursuant to subpoena and threat of being detained as a material witness. His testimony was inconsistent with that of the others in several respects and, unlike the other witnesses, was challenged on cross-examination on the basis of a lack of credibility.

Knot testified that he had been shown as many as 60 photographs by the police, although the record did not reveal whose photos he was shown or when the photo lineups occurred. He stated that when shown the photos he did not see anyone he recognized from the incident. He testified that thereafter he refused to cooperate with the police investigation.

At trial, nearly two years after the shooting, he identified the two black men sitting at the defense table as the assailants.[21] He testified that King punched Easterly and that King then ran off and then the groups confronted each other. He testified that Ross, who was one of several big

---

[20] The photos showed the individuals from the neck up.

[21] In *People v Kachar*, 400 Mich 78, 92-93 n 16; 252 NW2d 807 (1977), Justice William's lead opinion noted the weakness of such testimony:

> Ordinarily, when a witness is asked to *identify* the assailant or thief, or other person who is the subject of his testimony, the witness's act of pointing out the accused (or other person), then and there in the courtroom is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity. The failure to recognize would tell for the accused; but the affirmative recognition might mean little against him. (Emphasis in original.) 4 Wigmore on Evidence (3d ed. Supp), § 1130, quoted in Comment, *Erroneous Eyewitness Identification at Lineups— The Problem and Its Cure*, 5 U San Fran L Rev 85, 90 (1970) (emphasis in original). *See also United States v Toney*, 440 F 2d 590, 592 (CA 6, 1971) (McCree, J., concurring), for discussion of courtroom identification as highly suggestive. [citations and emphasis in original; quotation marks omitted.]

college football players in Knot's group, began walking towards the other group, and that Blevins pulled out a gun and said, "I got something for your big [ass]." He described the man with the gun as "light-skinned," about "six one," and "skinny," in the range of "190, 185" pounds. Police testimony established, however, that Blevins actually weighed 245 pounds. According to Knot, the man who displayed the gun addressed Smith by his nickname and appeared to know him. He testified: "the guy with the gun was talking to Cortez [Smith], and Cortez was trying to break it up. And he told Smith, '[Tez], you good, but you know [fuck] them.'" No other witness testified that the man who displayed the gun, or indeed anyone in King's group, called Smith by his nickname or spoke to him at all. Moreover, there was no evidence offered that Blevins and Smith knew each other or had ever met.

Knot testified that King then returned with a gun and began firing, at which point Knot hid and ran. He testified, consistent with his on-scene statement to the police, that he saw two separate guns but that the only one was fired.

### 4. ROSS

Ross testified that he had had a couple of shots of vodka shortly before the shooting. He recalled hearing Easterly calling out and then finding him bleeding from the nose after being punched. He stated that King's group numbered between six and eight, none of whom he knew previously. He identified Blevins as being in that group. Ross recalled that unfriendly words were exchanged between the two groups. He said he began walking towards the other group, asking why Easterly had been attacked. He heard a man say, "I got something for you" and saw him lift a gun from his waist and point it at him. He testified that the man who spoke and held the gun was *not* Blevins and described the man as approximately 180 pounds.[22]

Ross explained that he backed up, turned around, and immediately heard a shot. He did not think that there was time for the man with the gun to have passed the gun to anyone else. He said he ran and hid behind a dumpster and heard between eight and ten gunshots.

Ross testified that he did not see Blevins with a gun nor did he believe Blevins fired any shots. On June 10, he was shown a photo array that included Blevins. He wrote next to Blevins's photo that he had "seen him at the scene with the group." When asked by the police what he saw Blevins do, he stated "I didn't see him do anything other than stand there."

### 5. DRUMMOND

Drummond initially testified that he had no alcohol on the evening of the incident. However, after being shown his preliminary examination testimony he conceded that he had had a couple of drinks that evening and that "it did slip my mind."

Drummond testified that he saw King punch Easterly after Easterly urinated. He testified that another, lighter-skinned man was with King at that time, but that this second man was not

---

[22] As already noted, Blevins weighed 245 pounds.

Blevins. Drummond stated that, believing that "they got a fight going on," he punched King's companion and then the four "tussled" for about 30 seconds. Almost immediately afterward, the two groups stood opposite each other: 7 in his group and 6 or 7 in the other group. He testified that Blevins and King were in the other group. According to Drummond, "everybody in [my] group [was] upset . . . I think it's about to be a fight." Drummond stated that Smith then began walking towards the other group trying to get everyone to calm down. Then, a man he identified at trial as Blevins pulled out a gun and said something like "you don't want this" or "this ain't what y'all want." Drummond said that when he saw the gun, he froze and put his hands up to show he did not mean to take things any further. However, Ross and Knot kept walking "aggressive like" toward the other group despite his verbal warning to them that there was a gun. Drummond testified that he saw Blevins hand the gun to King, but said he did not hear any words pass between them. Within a few seconds, King fired one shot at the ground and then a few seconds later he fired in the direction of the Drummond and his friends. Drummond testified that as soon as King fired the first shot, everyone in both groups, including Blevins, began to run. Only King remained in place.

Drummond testified that the police showed him several headshot photo arrays at several different times. On May 9, he was shown an array in which King and Blevins were not pictured. He selected one photograph from this group, but the person who he selected was not a suspect. He was shown another array on May 23, from which he selected two men: King and one other (not Blevins) as possibly being the shooter. On June 9, he picked out two other men from an array, neither of whom became suspects. On June 11, Drummond was shown yet another array of headshots and in this one he identified Blevins "from the night [of the shooting]" and wrote that he "pass[ed] the shooter the gun." At trial stated that he was "100 percent" sure than Blevins displayed and passed the gun. He agreed on cross-examination that on the night of the shooting, he told the police the man who drew the gun was "skinny."

## 6. MALONE

Malone testified that he saw King and Easterly get in a scuffle, but did not see anyone with King at that time. When he saw King hit Easterly, he and his friends "was all approaching to go fight" and, as they did, Blevins, who was in the group with King "showed us the gun" and "we all backed up." Malone explained that by "showed us the gun" he meant that Blevins "picked his shirt up to show us." Malone testified that King then said "give me the mag" and shortly thereafter King started firing. He surmised that defendant passed King the gun, but he did not see it actually being passed. He first identified Blevins during a June 11 headshot photo array. On cross-examination, Malone agreed that on the night of the incident he told the police that the man who displayed the gun was 6 foot three inches and only 145-150 pounds, i.e. 100 pounds less than Blevins's actual weight. He also agreed that at the preliminary examination he had testified that the gun was a revolver because it had a rotating cylinder, although the gun was in fact an automatic. Malone explained that the situation "happened pretty quickly" and that he had seen over 100 people on the night of the shooting.

## 7. SUMMARY OF TESTIMONY

There were six witnesses to the shooting, several of whom had been drinking. The first four gave testimony that did not implicate Blevins as a shooter or as the person who supplied King with the gun. Spearman remembered nothing. Easterly remembers saying that there were

two "light-skinned" males in the other group and that the one involved in the fistfight with him was not Blevins. He testified that he could not place Blevins at the scene at all, let alone as the man who passed the gun to King. Knot offered testimony that varied substantially from all the other witnesses. Unlike every other witness, he testified that the man who displayed the gun knew Smith personally, called him by his nickname, that two men had guns at the scene, but that only one of them fired, and that no gun was passed. Although it had been nearly two years since the incident and he had never before identified Blevins or King, Knot identified them at trial as the men with the guns. He testified that only King fired. Ross, testified that Blevins was in the opposing group but that he could not say that he displayed or passed a gun. Drummond and Malone testified that Blevins was the man who displayed the gun and provided it to King. However, on the night of the shooting each told the police that the man in question was very skinny and their initial identifications were based on headshot photos that did not reveal build. There was no evidence presented from either side regarding the number of photo arrays examined by Malone or whether Malone made any selections from those arrays. Although Drummond had selected several photos of non-suspects before and after he selected Blevins, he nevertheless told the jury that he was "100% certain" that Blevins was the man who passed the gun to King.

## C. GROUNDS FOR REVERSAL AND NEW TRIAL

Given the state of scientific knowledge concerning eyewitness identifications and the factors that increase or lessen their reliability, I would conclude that defense counsel was ineffective in this case. At the *Ginther* hearing defense counsel agreed that he made no effort to learn about or make use of the available science. He explained that he did not do so because he did not think that jurors convicted on the basis of eyewitness identifications, a view that is difficult to square with his testimony that the entire case came down to identification and that the only evidence in this case was that of the eyewitnesses. He also testified that he did not request a modified identification instruction because he had never done so in his 40 year career, which given his lack of familiarity with the advances in cognitive science is not surprising.[23]

Given the facts of this case, I would conclude that counsel's strategy was not reasonable and that the failure to present expert testimony or request a special instruction constituted ineffective assistance of counsel.[24] At least in cases where the proofs of guilt consist exclusively of eyewitness identification testimony, a failure to request such an instruction and/or offer expert testimony describing generally accepted cognitive scientific findings about eyewitness memory

---

[23] Defense counsel is a highly regarded and sought-after trial attorney. However, even excellent attorneys make serious errors from time to time and while there are great benefits to experience, it can sometimes lead to complacency regarding the need to stay abreast of newer developments.

[24] Dr. Seifert's affidavit states that she reviewed the preliminary examination and trial transcripts, the police reports, and photographic identification materials. She opined that the methods of identification used in this case involved "factors [that] have each been shown in scientific studies to impair eyewitness accuracy and to affect decision-making by triers-of-fact."

constitutes ineffective assistance of counsel. It risks conviction of an actually innocent defendant and "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v Olano*, 507 US 725, 736-737; 113 S Ct 1770; 123 LEd2d 508 (1993); *People v Carines*, 460 Mich 750, 753; 597 NW2d 130 (1999). Like fingerprint, blood typing, and DNA evidence, eyewitness identification testimony can greatly assist the truth-finding process, but only when a jury understands its scientific basis and its limitations.

For this reason, I would reverse and remand for a new trial. For the same reasons, I respectfully propose that our Supreme Court consider whether and how to revise the relevant jury instructions to embrace the scientific advances affecting eyewitness testimony.

## II. THE ARGUMENTS OF TRIAL COUNSEL

Defendant's brief also asserts that two aspects of the prosecutor's closing argument constituted misconduct, or alternatively, that defense counsel's failure to object constituted ineffective assistance of counsel. I agree that the prosecutor's arguments were improper in both respects, but conclude that only one of them rises to the level of reversible error.

## A. MISSTATEMENT OF AIDING AND ABETTING LAW

It is well-settled that mere presence is insufficient to establish guilt as an aider and abettor. *People v Wilson*, 196 Mich App 604, 614; 493 NW2d 471 (1992). However, the prosecution's opening statement and closing argument substantially distorted the meaning of the law, so as to encourage the jury to find guilt not on the basis that Blevins provided the gun to King, but on the basis of guilt by association, an argument which was of unique import given the facts of this case.

The prosecution argued, both implicitly and explicitly, that guilt should be assigned on a group or "team" basis, a metaphor particularly powerful in this case given that two groups of young men, one of which contained several members of the WSU football team, lined up against each other. The prosecutor repeatedly argued that guilt could be assigned to the entire "team" that stood with King and repeatedly analogized to the fact that every member of a team shares credit for a win or loss, even those who are just sitting on the bench.

In his opening statement the prosecutor said:

You'll hear these groups kind of pair off facing each other. Words are exchanged. Some people try to do some peacemaking. But then you'll hear that *in the defendant's group* a gun is produced. [emphasis added.]

He continued with this theme when by asserting that: "[A]ll the shots that were fired were fired by *the defendants' group*." (emphasis added). Further, the notion of group liability was again emphasized in the context of the two groups being two opposing teams:

[T]he evidence will show you that night they were acting as a team. Unfortunately far more effective than my Michigan Wolverines were last night. . . . They were together during the confrontation. . . . These groups pair off like

rival time. Gun was displayed, not in Mr. Smith's team or anybody of that team but by this other side.

This line of argument was repeatedly emphasized during the prosecution's closing argument. In discussing the concept of aiding and abetting, the prosecutor said: "The Judge has talked to you about aiding and abetting. I'm not going to go over all the instructions with you, but *what I think you need to look at is this whole team concept that comes into play*." (emphasis added). He went on to say:

[A] football team gets credit for touchdown when the defense recovers the ball in the fumble in the end zone. Even if we can't see who recovered the ball, may be a dispute between us and our friend as to exactly who got the ball. Everyone on the team from the start[er] to the bench warmer gets the same ring if that team wins the championship. Because every one of them in a larger or smaller way contributed to that championship. Like Bo Schlembecker [sic] said back in 1983, everything is the team. The team.

Describing what happened after King punched Easterly, the prosecutor argued:

Then [Easterly's] friends come to intervene. Mr. Blevins comes to Mr. King's aid with some other people. The gun is displayed. As the groups pair off, words are exchanged. Smith comes in trying to calm people down. I think Mr. Drummond said he was trying to kind of hold Mr. Ross back. Told you shots are fired at Mr. Smith's group. Mr. Smith is hit dead. Mr. Spearman is left wounded. The defendants flee. And even if there are some discrepancies of exactly who did what when, there is no doubt that they acted together to bring about this deadly mayhem. Teammates. They deserve the same credit for the crime.

The prosecutor's words did not merely suggest that the shooter and whoever handed him the gun were a team, but that they were members of a team made up of everyone who stood with them. He argued that the defendants "acted together *as part of* an assaultive and deadly team." (emphasis added). And when noting the absence of self-defense, the prosecutor again referred to the "group" that committed the crime, stating that "not at issue is did *these people in the group that killed Mr. Smith* or wounded Mr. Spearman and shot at the others act in some kind of lawful self-defense." (emphasis added)

A prosecutor's misstatement of law can necessitate reversal where it deprives defendant of fair trial. *People v Matulonis*, 115 Mich App 263, 267-268; 320 NW2d 238 (1982). The comments of the prosecutor would not be improper in a case where the primary actor is accompanied only by the individual charged with abetting him. Here, however, there is a larger group which the prosecutor repeatedly refers to as a unit and suggests that they all "get the credit." They were not mere bystanders in the sense that they just happened to be nearby when someone fired a gun. The evidence demonstrated that they chose to stand with King when the other group approached him. However, there was no evidence that any of them, engaged in violence or urged King to do so. Only one member of their "team"—the one who handed the gun to King—took an action that aided King in committing his crime. The evidence of who handed the gun to King was highly contested; but there was no doubt that defendant was part of

King's "team" along with four or five others. Juror doubts regarding the identification could easily have been tempered by the knowledge that even if they could not be sure that defendant handed King the gun, they could be sure that he was a member of the "team" that shares the "credit." Under these circumstances, I cannot conclude that the standard instructions given by the trial court was sufficient to correct the plain error. Moreover, defense counsel should have carefully rebutted this argument and sought a curative instruction specifically to clarify that even if defendant was part of the group that stood with King, he could only be convicted if the jury concluded that he provided or fired the weapon. He did neither. Indeed, in his closing argument defense counsel agreed with the prosecutor's statements when he stated:

> I don't know what to tell you about the team concept . . . the team concept of aiding and abetting, all that's accurate.

Because the prosecutor's comments went to the heart of what constitutes criminal conduct, I would find that that the defense counsel's decision to agree with the prosecutor's statements rather than to object to them and seek a corrective instruction constituted ineffective assistance of counsel.

## B. INVOKING SYMPATHY

The defense also argues that the prosecution's argument improperly invoked sympathy by repeatedly describing the victim as a "peacemaker." There was a factual basis for this description because, in the prosecutor's words, the victim had attempted to get everyone at the scene to "chill out." Reference to the facts is not improper and in and of itself, it represented only a brief, non-prejudicial reference to the victim's good character. However, in my view, the prosecutor's argument was improper in the manner in which he addressed this fact.

The prosecutor's argument began with a three-page discourse comparing the victim to renowned peacemakers who had been assassinated. "A prosecutor may not appeal to the jury to sympathize with the victim." *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008). "Nor may a prosecutor urge the jury to convict . . . on the basis of its prejudices." *Id*. In this case, the prosecutor compared the victim to Yitzhak Rabin and Anwar Sadat and discussed the Nobel Peace Prize several times. He spoke at length about the murder of Abraham Lincoln and that as a result of the killing of that peacemaker "we suffered the consequence for over 100 years." He argued that "in our society peacemakers are considered people that deserve recognition." None of these observations had anything to do with the factual determination that the jury was to make. They were clearly intended to heighten emotions and sympathy and, in effect, to lower the burden of proof as to the facts. In my view, such comments are not cured by a trial judge's standard one-sentence instruction that the jury should not allow sympathy to enter into their decision.

There was no objection to this argument, however, and unlike the prosecutor's "team" references, I do not believe that allowing these comments rose to the level of "plain error" nor that the failure to object constituted ineffective assistance of counsel.

## III. CONCLUSION

I would reverse and remand for a new trial because defense counsel provided ineffective representation on the issue of eyewitness identification and in failing to object to the prosecution's closing argument based on "team" responsibility.

/s/ Douglas B. Shapiro